IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MELINDA THOMPSON, Individually and as Administrator of the Estate of Gregory Thompson, Jr., deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 3:11-cv-00392 |
| v. | ) ) | Judge Nixon |
| CITY OF LEBANON, TENNESSEE, et al., | ). ) | Magistrate Judge Knowles |
| Defendants. | ) ) | JURY DEMAND |

## ORDER

Pending before the Court is Defendant City of Lebanon, Tennessee's Motion for Summary Judgment ("Lebanon Motion") (Doc. No. 108). Plaintiff Melinda Thompson filed a Response in Opposition ("Response to Lebanon Motion") (Doc. No. 184), to which Lebanon filed a Reply (Doc. No. 200.) In connection with the Lebanon's Motion, Plaintiff also filed a Motion to Strike Defendant's Statement of Additional Undisputed Facts in Support of Its Reply to Plaintiff's Response to City of Lebanon's Statement of Additional Undisputed Facts ("Plaintiff's Motion to Strike"). (Doc. No. 209.) For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** Lebanon's Motion (Doc. No. 108) and **DENIES** Plaintiff's Motion to Strike (Doc. No. 209).

Also pending are Defendants Scott Bowen and Billy Weeks' Motion for Summary Judgment ("First Bowen Motion") (Doc. No. 141) and Second Motion for Summary Judgment ("Second Bowen Motion") (Doc. No. 155). Plaintiff filed a Response to the First (Doc. No. 178) and Second Bowen Motions (Doc. No. 183). Bowen and Weeks filed a Reply to Plaintiff's Response to the Second Bowen Motion. (Doc. No. 205.) For the reasons stated below, the Court **GRANTS** the First and Second Bowen Motions. (Doc. Nos. 141; 155.)

1

Defendants Mitchell Owen McDannald and David Lee McKinley filed a separate Motion for Summary Judgment ("McDannald Motion"). (Doc. No. 138.) Plaintiff filed a Response in Opposition to the McDannald Motion. (Doc. No. 185.) McDannald and McKinley also filed a Motion for Permission to File Supplemental Reply to Plaintiff's Response in Opposition to Their Motion for Summary Judgment (Doc. No. 226), with case law in support (Doc. No. 227). Plaintiff also filed an Objection to and Motion to Strike Certain Statements of Undisputed Facts Filed by Defendants McKinley and McDannald ("Motion to Strike Officer Statements"). (Doc. No. 167.)

For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** the McDannald Motion (Doc. No. 138), the Court **GRANTS** Plaintiff's Motion to Strike Officer Statements (Doc. No. 167), and the Court **DENIES** McDannald and McKinley's Motion for Permission to file Supplemental Reply (Doc. No. 226).

## I.   FACTUAL BACKGROUND[1]

### A.   The Incident

In the early morning hours of April 28, 2010, Gregory Thompson was seen driving erratically and then pursued at speeds up to seventy miles per hour by two officers then employed by the City of Lebanon Police Department ("LPD"). The chase ended when Thompson's car spun out, crashing into an embankment. Thompson remained seated in his demolished vehicle, and it is not known whether he was conscious. At that time Thompson was suspected only of impaired driving and, once he crashed, he posed no actual or apparent threat to the officers. Nonetheless, within nineteen seconds of the vehicle crash, the officers fired at least fourteen rounds of

---

[1] Unless otherwise indicated, the facts in this section are undisputed and are taken from Plaintiff's Response to McDannald and McKinley's Statement of Undisputed Material Facts (Doc. No. 179), Plaintiff's Response to Bowen and Weeks' Statement of Material Facts (Doc. No. 180), Plaintiff's Responses to Lebanon' Statement of Undisputed Material Facts (Doc. No. 181), Lebanon's Responses to Plaintiff's Joint Statement of Additional Facts (Doc. No. 199), McDannald and McKinley's Response to Plaintiff's Joint Statement of Additional Facts (Doc. No. 203), and Bowen and Weeks' Reply Statement to Plaintiff's Statement of Additional Facts in Dispute (Doc. No. 206).

ammunition, at least thirteen of them directly at the immobile Thompson. Thompson died at the scene of the gunshot wounds.

The encounter between Thompson and the officers began at approximately 3 a.m. that morning, when David Lee McKinley, a Lebanon Police Department ("LPD") officer since terminated for perjury and other misconduct, was on a routine patrol. While waiting to turn onto East Main Street, McKinley observed Thompson deviate from his lane of traffic while attempting to drive around a curve, and then come to a stop in front of McKinley's patrol car. Based on this observation, McKinley believed Thompson was driving while impaired. McKinley activated his lights, at which point Thompson backed up his vehicle and turned onto Carthage Highway, with McKinley in pursuit. McKinley activated his siren and followed Thompson. He was joined in pursuit of Thompson by Defendant Mitchell Owen McDannald, also a since-terminated LPD officer, who attained speeds of up to 120 miles per hour in his efforts to join in the pursuit of Thompson. After about six minutes of pursuit, Thompson crashed his car on Carthage Highway and was immobilized.

What happened after the crash is largely undisputed. First, McKinley emerged from his patrol car, drew his gun, ran toward Thompson's crashed car, and fired a shot. Then, McDannald, who had also emerged from his cruiser, fired thirteen rounds in succession at Thompson—who was sitting in the driver seat of his car not moving his arms—and killed him. It is undisputed that by jumping out of his cruiser and running toward the crashed vehicle with his gun drawn, McKinley was in violation of multiple LPD policies. What is highly material and fairly disputed is why and how McKinley fired the initial shot.

B.    *McKinley and McDannald's Careers at the Lebanon Police Department*

David McKinley was hired as a police officer for the LPD in December 2007, five months after working for two years at and being terminated from the Watertown Police Department. At the

3

Watertown Police Department he had a history of dozens of documented disciplinary violations, including insubordination and violations of policy, including unlawful conduct in arrests. He was terminated. The Watertown Police Chief summed his short career up by saying, "he totally disregards orders and policies." (Doc. No. 199 at 8.) [2] He lied to the LPD about why he left the Watertown Police when he applied to the LPD, claiming that he "resigned" and, when asked, said he resigned because he had been subpoenaed in a lawsuit. Also, as part of his hiring, McKinley was given a "Computer Voice stress Analyzer" ("CVSA") examination, known colloquially as a "lie detector test," designed to verify truthfulness in the application process. McKinley's results showed deception in two of the nine relevant answers, those involving use of drugs and criminal arrests. He was retested with the same results. The LPD did not check on McKinley's employment status or history with the Watertown Police nor did it follow up on the problems indicated by the CVSA examination. It hired McKinley without further inquiry.

During the two years that McKinley worked at the LPD before the Thompson incident, the LPD became aware through alerts from its "Personnel Early Warning System" ("PEWS") that he had an unusually high number of uses of force and car chases. The LPD never notified or counseled McKinley about his unusual activities. The LPD also learned that he had stolen as many as fifty knives from suspects and collected them in a box at his home, but it was not until after Thompson was killed by the police officers that the LPD addressed this issue with McKinley. In early 2010, several months before the Thompson incident, he was involved in an assault on a civilian. The

---

[2] McKinley's documented infractions while employed part-time for two years at the Watertown Police Department include: improper emergency vehicle driving; improper conduct towards a suspect; excessive driving in violation of direct orders; failing to secure a loaded shotgun at the police station; failure to secure the police station on two occasions; failure to conduct required extra patrols as ordered by the Chief of Police; making improper and unjustified DUI arrests; performing too many field sobriety tests; using improper language; unsatisfactory work quality on two occasions; failure to follow instructions on two occasions; violation of safety rules; violations of rules or procedures on two occasions; improperly handling evidence and failing to log evidence of crime at the police department; improperly running stationary radar; running tags of female citizens while off duty to determine the age of female drivers; and failing to clock out when directed by Chief of Police.

4

victim of that assault made efforts to file a complaint against McKinley, but the LPD did not take the complaint until after the Thompson incident. In 2011 he was involved in a drunken bar fight, but was permitted to return to work although it is undisputed that had he not been a police officer he would have been arrested and convicted. Finally, in 2013, he was terminated for committing perjury in connection with securing a warrant, for pulling a suspect from a vehicle with a gun in his hand and for other misconduct.

In 2006, while dating the daughter of the LPD Public Safety Commissioner, Defendant Weeks, Mitchell McDannald was hired as a dispatcher. During the year that he worked in this position, he was cited by his supervisors for failing to respond to correction, for not taking his job seriously, for failing to conform to policy, and for defiance. Despite these known deficiencies, McDannald was hired as police officer for the LPD in December, 2007. In connection with his application for the police officer position, he, like McKinley, was given a CVSA examination. Like McKinley, his answers showed deception in two of the nine questions, in his case questions about stealing from employers and domestic violence. The LPD did not further investigate the issues raised by this examination. Shortly after he was hired by the LPD, McDannald was deployed to Iraq for about ten months, where he did construction and patrolled for "improvised explosive devices," a task he found stressful, and where he came under fire. He returned to work at the LPD in March 2009. The LPD did not provide him with any psychological evaluation before returning him to duty and provided no counseling. He received three disciplinary counselings over the next year leading to the Thompson incident. Ultimately he was fired by the LPD in 2012 for assaulting his pregnant wife and for lying about the incident during the discipline process.

*C. The Lebanon Police Department's Policies and Customs on Training, Supervision, and Discipline*

At issue in this case, with respect to the liability of Lebanon, are its policies and practices on training, supervising, and disciplining its police officers. The background on those issues is as follows.

It is undisputed on this record that handling scenes and suspects after high-speed chases presents special difficulties that obviously require specific policies and procedures for police officers. Officers in high-speed chases are likely to experience such effects as tunnel vision and adrenaline rush. However, until after the Thompson incident the LPD did not have a policy or a training program of any kind for its cruiser patrol officers on the specific procedures to follow when apprehending a suspect after a vehicle chase.[3] It did not provide procedures to follow when using a firearm after a vehicle chase. The only policy applicable to the use of firearms after a vehicle pursuit was the general use of force policy of the LPD, which provides:

> 1. An officer may use deadly force to affect an arrest only if all other reasonable means of apprehension have been exhausted or are unavailable, and where feasible, the officer is given a warning that deadly force may be used unless resistance or flight ceases;
>
> 2. The officer has probable cause to believe the individual to be arrested has committed a felony involving infliction or threatened infliction of seriously bodily injury;
>
> 3. The officer has probable cause to believe that the individual to be arrested poses a threat of serious bodily injury, either to the officer or to others unless immediately apprehended.

No further instruction is given to the officers about whether and when to use firearms, other than to prohibit firing through doors or windows unless the person inside is visible, and a prohibition against firing warning shots.

Regarding practices on the investigation and discipline of officer misconduct, at the time of the Thompson shooting, there is undisputed evidence that the LPD did not have an Internal Affairs

---

[3] Lebanon has raised a dispute on this fact by submitting an affidavit from a sergeant, Shane Petty, that purports to describe a training "on Friday" in 2008. The Court's assessment of that affidavit is *infra*.

Division or any standard or stated operating procedure for investigations of officer misconduct. At least some citizen complaints about the police were rebuffed or not investigated. Alerts on high numbers of officer uses of force were not followed by discussions with officers. Officers were returned to work after committing criminal acts. The LPD did not keep systematic or complete records on the citizen complaints it received and in at least one case redacted all records of such a complaint. It settled lawsuits without disciplining the officers whose actions led to the settlement. It is the opinion of Plaintiff's expert Dr. Geoffrey Alpert, an expert on the use of force at the University of South Carolina, that Lebanon "has failed to implement effective mechanisms to investigate complaints of officer misconduct," that it allows "officers to escape proper discipline," and that it "operates with a 'code of silence.'" (Doc. No. 199 at 180.)

### D. The Lebanon Police Department Investigation of the Thompson Shooting

As noted, the LPD does not have an Internal Affairs Division or a standard operating procedure for investigations of officer misconduct. LPD Detective Chris Melvin, a general assignment investigator in the Special Operations Division, was assigned to handle the internal Thompson investigation to determine whether the officers violated any LPD policy in the shooting. Melvin had no formal training on internal affairs investigations and had previously performed only between five and ten internal investigations, none of these involving an officer-involved shooting.

Melvin was called to the scene of the shooting on April 28, 2010, to collect evidence with the Tennessee Bureau of Investigation ("TBI"). Melvin's investigation of whether LPD policies were violated was independent of the TBI's criminal investigation, and he testified that there are no standard operating procedures for how to perform these investigations.

Melvin did not use his metal detector—and does not believe than any other investigating officer used a metal detector—to find shell casings or bullets behind the fence line where Thompson's vehicle had come to a stop. He also did not discuss the incident with any of the

7

officers at the scene, including McKinley and McDannald. In violation of proper crime scene procedures, a soda can, allegedly containing cocaine, was removed from the car prior to being photographed, and was not fingerprinted.

On April 30, 2010, two days after the shooting and a week before the internal affairs investigation had been completed, the Commissioner of Public Safety, Defendant Weeks, made a public statement to the media that the officers involved in the incident had acted according to LPD policy. Before the investigation was complete, the LPD Chief of Police, Defendant Bowen, made a similar media statement.

Meanwhile, Melvin's internal investigation consisted entirely of a review of the officers' incident reports and of limited portions of the dashcam videos of the incident. On instructions from Bowen, Melvin made no attempt to talk to either of the officers involved as part of his investigation. Instead Melvin merely reviewed the officers' incident reports and select portions of the dashcam videos of the incident. Melvin likewise made no attempt to speak with the officers' supervisors. He did not review their PEWS alerts. He did not review LPD policies on felony stop procedures, and was not even aware whether LPD had such a policy (though he later acknowledged, in the course of this litigation, that McKinley had violated this policy).

Although he acknowledges that the dashcam videos do not support McKinley's statement about falling, transitioning his weapon, or trying to reach for his armament systems and procedures baton ("ASP"), Melvin never questioned McKinley's account of the incident. He did not investigate whether McKinley had his finger on the trigger when he descended the embankment and did not inquire into whether this would be an LPD policy violation. He did not investigate which hand McKinley fired with. He did not examine the portion of the videos revealing what he later acknowledged was an LPD policy violation, when McKinley and McDannald turned off their microphones and conferred privately after being told to sit in separate cars. Melvin concluded his

8

investigation on May 11, 2010, determining "[t]here were no violations of departmental policy and procedure." Neither officer was disciplined in any way for his role in the death of Thompson.

### E. Procedural Background[4]

On April 27, 2011, Plaintiff filed an action against Defendants in this Court alleging a number of civil rights violations and state law negligence claims. (Doc. No. 1.) Plaintiff filed an Amended Complaint (Doc. No. 11) on June 15, 2011 and a Second Amended Complaint (Doc. No. 86) on March 26, 2013, removing her individual claims for negligent infliction of emotional distress. (*Id.*)

On October 1, 2013, Defendant Lebanon filed a Motion for Summary Judgment ("Lebanon Motion") (Doc. No. 108) with a Memorandum in Support (Doc. No. 109), supporting documents and affidavits[5], and a Statement of Facts (Doc. No. 117), requesting that the Court grant it summary judgment on Plaintiff's 42 U.S.C. § 1983 claims on the ground that there are no factual disputes as to its municipal liability and that it is entitled to judgment as a matter of law on these claims, and on Plaintiff's state law claims on the ground that it is immune under the Tennessee Governmental Tort Liability Act ("TGTLA"). Plaintiff filed a Response in Opposition ("Response to Lebanon Motion") (Doc. No 184), to which Defendant Lebanon filed a Reply (Doc. No. 200), and an Additional Statement of Undisputed Material Facts (Doc. No. 198).[6] In connection with Lebanon's Motion, Plaintiff also filed a Motion to Strike Defendant's Statement of Additional Undisputed Facts in Support of Its Reply to Plaintiff's Response to City of Lebanon's Statement of Additional

---

[4] The Court notes with dismay that many of the below submissions were voluminous and that many of the Memoranda of Law were responsive to other Memoranda, but that none of the parties assisted the Court in the resolution of the issues on their motions by the use of tables of contents, tables of cases, or the direct referencing by page numbers of opposing arguments. The Court strongly encourages all counsel in the future to make every effort to submit professional, accessible, and well-organized filings.

[5] (Doc. Nos. 110-1–110-7; 112-1; 119-1–119-3; 120-1–120-4; 121-1–121-3; 122-1–122-4; 123-1; 123-2; 124-1; 125-1; 126-1; 127-1)

[6] Plaintiff also filed a Joint Statement of Additional Facts in Dispute in Opposition to the Motions for Summary Judgment Filed by City of Lebanon, McKinley and McDannald, and Bowen and Weeks. (Doc. No. 182). Defendants City of Lebanon, Bowen and Weeks, and McDannald and McKinley each filed Responses (Doc. Nos. 199, 206, 203) to this Additional Statement of Facts in Dispute.

9

Undisputed Facts ("Plaintiff's Motion to Strike") (Doc. No. 209), seeking to exclude from the Court's consideration Lebanon's Additional Statement of Undisputed Material Facts (Doc. No. 198).

Defendants Bowen and Weeks also filed a Motion for Summary Judgment ("First Bowen Motion") (Doc. No. 141) with a Memorandum in Support (Doc. No. 143), supporting documents and affidavits (Doc. Nos. 141-1–141-5) and a Statement of Facts (Doc. No. 145). Bowen and Weeks also filed a Second Motion for Summary Judgment ("Second Bowen Motion") (Doc. No. 155) with a Memorandum in Support (Doc. No. 157), supporting affidavit (Doc. No. 155-1) and Statement of Facts (Doc. No. 156). Plaintiff filed Responses to the First (Doc. No. 178) and Second Bowen Motions (Doc. No. 183), to which Defendant filed a Reply (Doc. No. 205). Plaintiff also filed a Response to Bowen and Weeks' Statement of Facts. (Doc. No. 180.)

Defendants McDannald and McKinley filed a separate Motion for Summary Judgment ("McDannald Motion") (Doc. No. 138), with a Memorandum in Support (Doc. No. 139), supporting documents[7], and a Statement of Undisputed Material Facts (Doc. No. 140). Plaintiff filed a Response in Opposition to the McDannald Motion (Doc. No. 185) and a Response to McDannald and McKinleys' Statement of Undisputed Material Facts (Doc. No. 179). McDannald and McKinley also filed a Motion for Permission to file Supplemental Reply to Plaintiff's Response in Opposition to their Motion for Summary Judgment (Doc. No. 226), with case law in support (Doc. No. 227-1).

## II.    STANDARD OF REVIEW

Summary judgment is rendered when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must demonstrate that the non-moving party has failed to establish a necessary element of that

---

[7] (Doc. Nos. 144-1; 146-1–146-8; 147-1–147-9; 148-1–148-7; 149-1–149-5)

party's claim, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), and has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate that absence of a genuine dispute over material facts. Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

Summary judgment will be granted if "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996). The movant has the initial burden of informing the district court of the basis of the summary judgment motion and identifying portions of the record which lack a genuine issue of material fact to support the non-movant's case. *See Celotex*, 477 U.S. at 323.

The non-moving party may not rest solely on the allegations in the complaint, but must delineate specific evidence that shows there is a genuine issue for trial. *See id.* at 324. A "mere possibility" of a factual dispute is not sufficient to withstand a properly supported motion for summary judgment. *Baird v. NHP Mill Creek Apartments*, 94 F. App'x 328, 330–31 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter; it determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine if a reasonable factfinder could find for the non-moving party. *Id.* at 248. A party asserting or denying that a fact is genuinely disputed may support its position by (1) citing to particular parts of materials in the record, (2) showing that the materials cited by the opposing party do not establish the absence or presence of a genuine dispute, or (3) showing that an adverse party cannot produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).

All reasonable inferences are to be drawn in favor of the non-moving party and the evidence of the non-movant is to be believed. *Anderson*, 477 U.S. at 255. "Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment." *Id.* If the court determines that a reasonable factfinder could not find for the non-moving party, summary judgment must be granted. *See Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233.

## III. ANALYSIS

Plaintiff has filed federal claims under 42 U.S.C. § 1983 against all Defendants and state claims against McDannald, McKinley, and Lebanon. After dispensing of the pending Motions to Strike and Exclude, the Court evaluates the various arguments by Defendants for summary judgment on each claim in turn.

### A. *Motions to Strike*

As a threshold matter, Plaintiff has objected to and moved to strike Defendant Lebanon's Statement of Additional Undisputed Facts in Support of Its Reply and has also moved to strike Defendant Lebanon's Affidavit of Sgt. Shane Petty. (Doc. No. 209.) Lebanon filed a Response in Opposition. (Doc. No. 210.) Plaintiff argues that the Federal Rules of Civil Procedure and Local Rules do not authorize a party moving for Summary Judgment to submit a statement of additional disputed facts after the deadline for filing its Motion for Summary Judgment has expired, and that Sgt. Petty was not disclosed in discovery. (*Id.* at 2–3.) Considering that Defendant disclosed information about Sgt. Petty and his affidavit during discovery (Doc. No. 210 at 3), and that the Statement of Additional Undisputed Facts were in support of a Reply to Plaintiff's Response (*id.* at 2–3), *see* M.D. Tenn. Civ. R 56.01, the Court **DENIES** Plaintiff's Objections and Motion to Strike Defendant City of Lebanon's Statement of Additional Undisputed Facts in Support (Doc. No. 209.)

Plaintiff also filed an Objection to and Motion to Strike Certain Statements of Undisputed Facts Filed by Defendants McKinley and McDannald based on numerous of the facts cited being immaterial, irrelevant, inadmissible, impertinent, and scandalous. (Doc. No. 167.) Plaintiff sets

forth no legal support for its request that the Court strike specific facts. Plaintiff was free to argue the relevancy, materiality, impertenance, and scandalous nature of facts in its briefing, and may object to facts it believes are inadmissible in its responses to individual facts. However, the Court declines to strike individual facts prior to considering the merits of the Motions for Summary Judgment. As such, the Court **DENIES without prejudice** Plaintiff's Objections and Motion (*id.*). Plaintiff may refile the motion for the purposes of trial.

### B. Motions to Exclude

Plaintiff and Defendants Bowen and Weeks have each filed motions to exclude testimony of opposing parties' expert witnesses.

A court has broad discretion in ruling on the admissibility of expert testimony, including at summary judgment. *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir. 2005). Federal Rule of Civil Procedure 56(c)(4) provides that a "declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." In reviewing such declarations, a court should "disregard conclusions of law (or 'ultimate fact')" and consider only the facts provided. *F.R.C. Int'l, Inc. v. United States*, 278 F.3d 641, 643 (6th Cir. 2002).

At summary judgment, courts hold declarations by expert witnesses to the same standards as other declarations, *see Brainard*, 432 F.3d at 663, as well as to the standards of Federal Rule of Evidence 702, which governs the admissibility of expert testimony. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005). Federal Rule of Evidence 702 states that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

13

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As a result, "an expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *Brainard*, 432 F.3d at 664 (citation omitted). By contrast, "an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process" and his testimony may be disregarded. *Id.* (internal quotation marks and brackets omitted).

Plaintiff filed a Motion to Exclude the Testimony of Defendant's Expert Witness William J. Lewinski, PhD (Doc. No. 111), to which Defendants McDannald and McKinley filed a Response in Opposition (Doc. No. 202). The Court addresses the arguments in the Motion to Exclude only to the limited extent that they apply to the arguments put forward in the McDannald Motion. Plaintiff argues Lewinski's expert opinions should be excluded because his expertise is dubious and unrelated to the opinions he offers; his opinions are based on too limited an understanding of the facts; and he ignored facts that contradict his conclusions. (Doc. No. 111 at 7–19.) McKinley and McDannald respond that Lewinski's opinions are based upon a sufficient factual and evidentiary basis, and meet the relevant legal standards for expert testimony, thus making them reliable and admissible. (Doc. No. 202 at 8–20.)

The Court finds that Lewinski's characterization of the events captured in McDannald's video (Doc. No. 139 at 21) are instructive to the extent that he has a background in reviewing police encounters and has a differing opinion on what is captured in the video from Plaintiff's expert. However, Lewinski's ultimate opinions that McKinley's actions in the video are "consistent with McKinley's statement" and "had McKinley not fallen in combination with the gunshot, McDannald would not likely have fired because he would have taken time to consider the situation" (Doc. No. 202 at 9) are speculation, and opinions for which Defendants have provided insufficient support that Lewinski is uniquely qualified to offer. *See Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474

14

F.3d 288, 296 (6th Cir. 2007) (noting experts should adequately explain how their "experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts"). Accordingly, the Court **GRANTS** for the purposes of summary judgment only, the Motion to Exclude (Doc. No. 111) to the extent that Lewinski's opinions on the consistency between McKinley's statement and his actions in the dashcam videos as well as his opinion regarding why McDannald fired his gun will not be considered in the summary judgment ruling.

Plaintiff also filed a Motion to Exclude the Testimony of Defendant's Expert Witness Kenneth R. Wallentine (Doc. No. 115), to which Defendant Lebanon responded (Doc. No. 160). Plaintiff argues that Wallentine's report and deposition testimony show that he has does not have a sufficient background to opine on the issues in this case, and that his opinions do not have a sufficient basis in fact. (Doc. No. 115 at 8–18.) However, as Defendant Lebanon points out, they do not rely on this expert's testimony in their Motion for Summary Judgment. (Doc. No. 160 at 1–2.) Accordingly, as the Court finds Plaintiff's motion is premature, the Motion to Exclude the Testimony of Defendant's Expert Witness Kenneth R. Wallentine (Doc. No. 115) is **DENIED without prejudice**.

Plaintiff also filed a Motion to Exclude the Testimony of Defendant's Expert Witness Ronald L. Crew (Doc. No. 118), on the basis that Crew's testimony is "unreliable and unlikely to assist the trier of fact." (*Id.* at 2.) Moreover, Defendant does not rely on Crew's testimony at this stage. As such, the argument is not yet ripe with respect to the reliability of Crew's statements and the Court **DENIES without prejudice** the Motion to Exclude (Doc. No. 118) at this, the summary judgment stage.

Defendants Bowen and Weeks filed a Motion to Exclude Portions of Plaintiff's Rule 26(b)(6) Expert Disclosures of Geoffrey Alpert (Doc. No. 136) with a Memorandum in Support

15

(Doc. No. 137) and a *Daubert* Motion to Exclude Testimony (Doc. No. 153) of the same expert. As this Order dismisses Defendants Bowen and Weeks from the litigation, the Motions (Doc. Nos. 136; 153) are **TERMINATED as moot.**

    *C.*    *First Bowen Motion*

Bowen and Weeks's First Bowen Motion asks the Court to dismiss all of Plaintiff's individual claims against them. (Doc. No. 141.) Plaintiff responds that she has not asserted any individual claims but proceeds on behalf of Thompson's estate, and that she does not object to the First Bowen Motion to the extent that it seeks to remove reference to her individual claims. (Doc. No. 178 at 2.) Accordingly, the Court **GRANTS** the First Bowen Motion (Doc. No. 141).

    *D.*    *Existence of a Constitutional Violation*

Defendants Lebanon, McDannald and McKinley, and Bowen and Weeks each argue that, because McDannald and McKinley did not violate Thompson's constitutional rights, Thompson has failed to allege a basis for a 42 U.S.C. § 1983 cause of action. (Doc. Nos. 109 at 22–26; 139 at 23–26; 157 at 4–6.) Defendants McDannald and McKinley further argue that this lack of a constitutional violation entitles them to qualified immunity. (Doc. No. 139 at 32–35.)

    1.    <u>The Pursuit</u>

McDannald and McKinley argue that they are entitled to summary judgment for any claim based on a theory of liability premised on McKinley's decision to initiate a pursuit of Thompson being unconstitutional. (Doc. No. 139 at 24–26.) Plaintiff responds that she "does not claim that the pursuit itself was unconstitutional" and "does not offer the facts of the pursuit as independent grounds for § 1983 relief," and instead seeks to have the pursuit considered in the Court's analysis of the objective reasonableness of the officers' use of deadly force. (Doc. No. 185 at 13–14.) Accordingly, the Court GRANTS the McDannald Motion on any claim that the pursuit itself, up to the point when Thompson's vehicle crashed, was independently unconstitutional.

16

## 2. McKinley's Fourth Amendment Seizure of Thompson

Defendants argue that McKinley did not seize Thompson within the meaning of the Fourth Amendment, and therefore any theory of liability against him (and, by extension, the other Defendants) under the Fourth Amendment must fail as a matter of law. (Doc. Nos. 109 at 22–24; 139 at 26–28; 157 at 4–6). Defendants point out that a seizure occurs only when an officer employs physical force or makes a demonstration of authority and there is then either a resulting physical contact or submission to the officer's authority. (Doc. Nos. 109 at 23; 139 at 26; 157 at 5); *see California v. Hodari D.*, 499 U.S 621, 625–29 (1991). Defendants state that there is no evidence in the record that McKinley physically touched Thompson or that Thompson submitted or surrendered to McKinley. (Doc. Nos. 109 at 23; 139 at 27; 157 at 5.)

A court reviews "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "At the summary judgment stage," once a court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [an officer's] actions . . . is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis removed).

In determining whether an officer acted reasonably, a court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). Courts are to draw on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses and immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. In addition, the Sixth Circuit has held that "the definition of reasonable

force is partially dependent on the demeanor of the suspect." *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) (internal quotation marks omitted). The reasonableness of the force "involves a fact-specific inquiry based on the totality of the circumstances," *Morrison v. Bd. Of Trs. of Green Township*, 583 F.3d 394, 401 (6th Cir. 2009), and must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396.

### (a) Credibility and Factual Disputes Surrounding McDannald and McKinley's Accounts of the Shooting

As a preliminary matter, the Court finds it necessary to point out that McKinley and McDannald are the only living eyewitnesses to the events immediately preceding the shooting and the only witnesses to the firing of McKinley's initial shot. The former officers maintain that McKinley's bullet never made contact with Thompson, that McKinley's discharge of his weapon was entirely accidental and resulted from his loss of balance, and that there is no evidence in the record to dispute these contentions. However, the Court notes that the video evidence submitted is ambiguous on these points. (*See* Doc. No. 177, manually filed "McKinley Dashcan" and "McDannald Dashcan".) Additionally, as detailed below, there are conflicting assessments by the parties' expert witnesses as to what occurred during the shooting. Officer Paris' statements suggest a different series of events than what was reported by McKinley and McDannald, and numerous inconsistencies in McKinley and McDannald's accounts call their narratives into doubt, in addition to other significant reasons that a jury might question their credibility.

None of the Defendants in this case dispute the following facts regarding McKinley's history of dishonesty: McKinley was terminated from the LPD for, among other things, suspicion of perjury, dishonesty, and a documented history of stealing 40–50 knives while in service (Doc. Nos. 182 ¶ 72, 365(d)–(e); 199 at 43, 164; 206 at 41, 145; *see* Doc. No. 203 at 2); McKinley lied in his

18

application for employment with the LPD, stating that he had no disciplinary action against him at the Watertown Police Department ("WPD") (though he was disciplined on a good number of occasions)[8] and that his reason for leaving was "starting at Lebanon PD", (despite the fact that he was terminated from his WPD position)[9] (Doc. Nos. 182 ¶ 4, 365; 199 at 12, 164; 206 at 145; *see* Doc. No. 203 at 2); McKinley lied in his interrogatories in discovery for this case, stating that he was neither disciplined by nor terminated from the WPD (Doc. Nos. 182 ¶ 3–4; 199 at 12; 206 at 13; *see* Doc. No. 203 at 2).

The following facts concerning McDannald's credibility are also undisputed: McDannald failed, or showed signs of deception in, a pre-employment CVSA, and was terminated from the LPD after being arrested for domestic violence and having been untruthful during an LPD investigation.[10] (Doc. No. 182 ¶ 366 (a)–(b); Doc. No. 199 at 165; Doc. No. 206 at 83; *see* Doc. No. 203 at 2.)

"Courts may not resolve credibility disputes on summary judgment." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). While "[t]he prospect of challenging a witness'[s] credibility is not alone enough to avoid summary judgment," *id.* (quoting *Dugan v. Smerwick Sewerage Co.,* 142 F.3d 398, 406 (7th Cir.1998) (alteration in original), "summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses" or offers specific bases for possible impeachment. *Id.* (quoting *TypeRight Keyboard Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004) ("Clearly, if the credibility of the movant's witnesses is challenged by the

---

[8] *See* Doc. No. 182 ¶ 2(a)–(r) for a full accounting of the disciplinary action against McKinley's while employed with WPD.
[9] McKinley was terminated from the WPD in July, 2007, and applied for employment with the LPD in October, 2007. (Doc. No. 199 ¶ 2, 4.)
[10] Bowen and Weeks admit that termination proceedings "were commenced" against McDannald as a result of the domestic violence investigation, but dispute that McDannald "was terminated" in part of their Reply Statement to Plaintiff's Joint Statement of Additional Facts in Dispute (Doc. No. 206 at 164). However, elsewhere in this Reply Statement Bowen and Weeks admit that McDannald was terminated. (Doc. No. 206 at 48.)

opposing party *and specific bases for possible impeachment are shown*, summary judgment should be denied and the case allowed to proceed to trial.")). The Sixth Circuit has held that in the particular scenario where, as here, an officer witness has a documented history of dishonesty and neglects to answer questions during litigation in a forthright manner, these issues bear on the witness' mental state and establish a genuine dispute of fact. *Id.* at 452–453.

Additionally, several material aspects of the events surrounding the shooting are in dispute. McKinley maintains that as he descended the embankment, he transitioned his weapon to his left hand and began to reach for his baton to break the driver's side window because, in his words, Thompson

> was not responding to my commands. As I was reaching for it, my foot got stuck on a rock and I stumbled and started to fall. In an attempt to keep my balance I unintentionally discharged one round into the air.

(Doc. No. 129 at 68.)

Plaintiff contests this account, and submits the following in support: (1) McDannald's interrogatory responses stated that at the time of the shooting, "Thompson's driver side window was down" (Doc. No. 129 at 140), calling into question McKinley's statement that he was attempting to remove his baton to break Thompson's window; (2) there are conflicting assessments of whether the video evidence shows McKinley transitioning his weapon or stumbling (*see* Doc. No. 182 at 92–93); McDannald's story about what he observed when he first started shooting has changed over time (*id.* at 93–94); (4) Officer Paris observed McKinley standing upright with his gun trained on Thompson while McDannald was shooting (Doc. No. 174-3 at 31–32); and (5) McKinley did not initially inform the sergeant on the scene that he slipped or that his shot was accidental (*see* Doc. No. 182 at 95).

20

(b) Seizure Under the Fourth Amendment

Notwithstanding the above-mentioned disputes of fact concerning McKinley's actions, Defendants also overlook well-established case law calling upon courts to examine "all of the circumstances surrounding" an incident and ask whether "a reasonable person would have believed that he was not free to leave" under those circumstances, in determining whether an individual has been seized. *United States v. Mendenhall,* 446 U.S. 544, 554 (1980). The precise cause of the "termination" of a subject's movement for the purposes of a seizure need not be the very same method the officers intended to use to immobilize or detain. *Brower v. Cnty of Inyo*, 489 U.S. 593, 597-99 (1989) ("In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.") Further, unlike the plaintiff in *Adams v. City of Auburn Hills*, Thompson did not "reach his destination" after the show of police force. 336 F.3d 515, 520 (6th Cir. 2003) (finding a reasonable person in the plaintiff's position would not consider himself seized for the purposes of the Fourth Amendment because despite a police officer firing bullets at the plaintiff's car, the plaintiff's movement was not impaired, and the plaintiff did in fact reach his destination).

"Whenever an officer restrains the freedom of a person to walk away, he has seized that person. . . . While it is not always clear just when minimal police interference becomes a seizure, . . . there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (citations omitted).

Case 3:11-cv-00392  Document 297  Filed 06/10/14  Page 21 of 45 PageID #: 8613

Lebanon, Bowen, and Weeks focus on Plaintiff's lack of evidence that McKinley's initial bullet, in addition to McDannald's subsequent barrage of bullets, actually made contact with Thompson's person. (Doc. Nos. 109 at 23; 157 at 5). However, not all bullets fired from the former officers' weapons were recovered from the scene. (Doc. No. 181 ¶ 16.) Plaintiff notes that, out of fourteen rounds fired, five bullets were both recovered from the vehicle and positively identified as originating from McDannald's weapon, but at least one additional bullet was not identified as originating from either weapon. (*Id.*) The remaining bullets were unaccounted for. (Doc. No. 199 at 99–100.) The Sixth Circuit has previously held that where an individual is shot at by a first officer, then shot at by a subsequent officer, resulting in impact by the second officer's bullets, even if it is later conclusively determined that the first officer's bullet did not make contact with the individual, that first officer's action amounts to a seizure because it "had the intended effect of contributing to [the individual's] immediate restraint." *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008). Taking the evidence in the light most favorable to the Plaintiff, the Court finds that there is a dispute over the intention behind and trajectory of McKinley's bullet, and for the purposes of summary judgment McKinley seized Thompson. Unlike the plaintiffs in *Adams,* 336 F.3d at 520 and *Cameron v. City of Pontiac,* 813 F.2d 782, 785 (6th Cir. 1987), where the court found no seizure because the plaintiffs continued to flee after officers fired shots, Thompson made no apparent attempt to flee at any point after McKinley fired the first shot. (Doc. No. 199 ¶¶ 114–117); *see Floyd*, 518 F.3d at 406. When officers collaborate in effectuating a seizure by collectively shooting, although one officer may have failed to hit the individual's person with a bullet, that officer is nevertheless a participant in the ensuing seizure. Here, there is a material dispute of fact as to whether McKinley intended to shoot and the trajectory of his bullet and summary judgment is thus not appropriate on this issue of whether a seizure occurred.

3.  Objective Reasonableness of McKinley's Actions

McDannald and McKinley ask the Court to find that McKinley's actions when he approached Thompson's crashed vehicle with his weapon drawn, and then discharged the weapon, were objectively reasonable and therefore constitutional under the Fourth Amendment.

Factors courts consider when addressing the reasonableness of a law enforcement officer's actions include: (1) the severity of the crime involved, (2) the immediacy of the threat to officers and others, and (3) whether the suspect is resisting arrest or attempting to flee. *Graham,* 490 U.S. at 396. Here, the balance of these factors weighs against finding reasonableness as a matter of law. The crime involved was a traffic offense, the immediate threat was apparently minor given that Thompson's car was immobilized and no civilians were near, and, other than not responding to McKinley's verbal commands within the few seconds between the time he crashed and the time he was shot, that there was no evidence he was resisting or attempting to flee.

Defendants state that the Sixth Circuit "has held, as a matter of law, that an officer's approach to a vehicle with a gun drawn is reasonable as a matter of law." (Doc. No. 139 at 29) (citing *Leber v. Smith,* 773 F.2d 101 (6th Cir. 1985). Despite Defendants' repetitious insistence that this action by an officer is, by its nature, reasonable "as a matter of law," the Court finds this argument misapprehends the impact of *Leber,* 773 F2d. 101. In *Leber* the court pointed out that the finding that the officer in question acted reasonably was reached only after "[c]onsidering the *factual circumstances* surrounding the incident in question." *Id.* at 105 (emphasis added). The court then pointed out that the officer had been informed by the suspect's brother that the suspect was "possibly irrational and suicidal" and the officer had accordingly considered that "the actions of an emotionally disturbed, possibly suicidal person are unpredictable" in deciding to draw his weapon on approach. *Id.* In the present case, the officers had no reports or other information regarding Thompson's mental state and were only aware of Thompson's erratic driving and failure

23

to stop for the officers when directed by activation of police lights and sirens. Thus, unlike in *Leber*, there is sufficient evidence in the record in this case to create a factual dispute as to whether McKinley's decision to draw his gun was reasonable.

The Court finds Defendants' reliance on *Tallman v. Elizabethtown Police Dep't*, 167 F.App'x 459 (6th Cir. 2006), to be likewise unavailing. While the facts may at first blush appear to present an analogous situation to that of Tallman, the Court finds there exist certain factually distinct elements in this case that distinguish it from Tallman and prevent the Court from determining, as a matter of law, that McKinley's actions were objectively reasonable. In *Tallman*, the officers were pursuing a vehicle with two occupants. *Id.* at 460. Once the vehicle came to a stop, one occupant fled on foot and the other occupant—the plaintiff in *Tallman*--was issued a verbal command by an officer to put his hands up, which the plaintiff failed to respond to. *Id* at 461. The court relied on the plaintiff's failure to comply with the command in determining it was objectively reasonable for the officer to keep his gun drawn in attempting to pull the plaintiff out of the car. *Id.* at 466. In the present case, it is undisputed that Thompson made no efforts to flee the vehicle, and that, the total time during which McKinley exited his vehicle, ran towards the crash site, descended the embankment, gave Thompson two commands, and wielded and discharged his weapon was less than fifteen seconds. (Doc. No. 199 at 70–71.)

There remains a significant question as to whether this behavior was objectively reasonable, and numerous facts exist that distinguish this case from *Tallman*. First, McKinley was not approaching a vehicle that was on level ground with the roadway, but rather was holding his firearm as he descended the steep embankment into a crash site, thus handling his weapon while trying to maintain his balance on the descent. (Doc. No 199 at 70.) Further, unlike the plaintiff in *Tallman*, Thompson's vehicle had been immobilized by crossing the opposing lane of roadway and crashing onto a steep embankment, not simply by having his tires blown by police-laid "stingers." (Doc. No.

24

199 at 61); *Tallman*, 176 F. App'x at 460–461. Further, whereas in *Tallman*, the plaintiff might have been expected to respond to verbal police commands as there appear to have been no signs of a traumatic crash, here, there is some question as to whether it is reasonable to expect a man who has, (1) crashed his car at a high speed mere seconds ago, (2) might, based on the severity of the crash, very well be stunned, unconscious, or otherwise injured, and (3) could, based on the circumstances and observances of the officers, very likely be intoxicated, to respond immediately to an officer's verbal command. The elapsed time from McKinley's first command until Thompson was shot and killed was less than ten seconds. (Doc. No. 181 at 5.)

There is an additional dispute over direction in which McKinley's gun was aimed when he discharged a bullet, and whether the bullet made impact with Thompson or his car. Defendants state that McKinley "believed his gun shot 'up in the air,'" but as Plaintiff points out, the video evidence does not necessarily support this contention, and one of the bullets recovered from inside the vehicle did not have sufficient markings to determine which weapon it came from. (Doc. No. 181 at 8.) Finally, whereas in *Tallman*, the officer shot his own hand, providing rather conclusive evidence that the shooting was accidental, 167 F. App'x at 461, there is no such evidence in the record here, and, indeed, Paris testified that when he saw McKinley while McDannald was shooting, McKinley was standing upright with his gun trained on Thompson. (Doc. No. 174-3 at 31–32.) The disputes of fact here distinguish this case from those in which summary judgment is granted for the objective reasonableness of an officer's actions.

### 4. Objective Reasonableness of McDannald's Actions

The Court assesses whether McDannald's actions were constitutional as a matter of law by the same objectively reasonable standard employed above for McKinley.

The Court finds that Plaintiff has shown sufficient evidence that a reasonable jury could conclude that McDannald acted unreasonably in dealing with a suspect who has crashed out seconds before the fatal barrage of bullets. First, as previously noted, McDannald's credibility is in dispute and the experts disagree over what the video footage reveals as to the sequence of events preceding McDannald's thirteen shots. *See Murray-Ruhl v. Passinault*, 246 F. App'x 338, 344–45 (6th Cir. 2007) (overturning the district court's grant of summary judgment to an officer because of credibility questions and a dispute over whether the evidence supported a perceived threat to life prior to the officer opening fire). Additionally, a reasonable juror could conclude that the use of thirteen bullets aimed at Thompson's person—when Thompson had been seen to do nothing more than flee from police during the vehicular pursuit for potential driving under the influence—was objectively unreasonable. *See id.* at 345 (summary judgment was inappropriate because "[the officer] continued firing past the need to do so" and it was unclear whether this was done "out of fear or concern rather than anger or frustration"). "[S]ummary judgment is generally not well suited for cases in which motive and intent are at issue and in which one party is in control of the proof." *Perry v. McGinnis*, 209 F.3d 597, 600 (6th Cir. 2000). While a violation of police policy is not dispositive on the issue of whether an action is constitutional, it is instructive that LPD policy requires that an officer must identify a threat every time he pulls the trigger. (Doc. No. 181 at 13) *See Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013) (local regulations and sources may "light the path to reveal the existence of a clearly established constitutional right"). Finally, in contrast to *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004), and *Plumhoff v. Rickard*, No. 12-1117, 2014 WL 2178335, at *8 (May 27, 2014), in this case Thompson made no movement to continue to flee after the crash or during the period when he was being fired upon.

E.     *Entitlement of McDannald and McKinley to Qualified Immunity*

26

McDannald and McKinley argue that the Court should dismiss the § 1983 claims against them because they are entitled to qualified immunity from suit. (Doc. No. 139 at 32–35.) "A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established" at the time. *Morrison*, 583 F.3d at 400. *see also Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). Courts must answer both of these questions "in the affirmative for the case to go to a factfinder to decide if each officer's conduct in the particular circumstances violated a plaintiff's clearly established constitutional rights." *Martin* 712 F.3d at 957. The Court has already determined that a material question of fact exists as to whether the former officers violated Thompson's constitutional rights; accordingly, the Court now considers whether the right in question was clearly established.

Under *Saucier*, the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 533 U.S. at 202. In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This inquiry "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). That is, "there need not be a case with the exact same fact pattern, or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)) (internal quotation marks omitted). The Sixth Circuit has cautioned courts not to define the right in question too narrowly, so as to avoid matching "each application of force [in §

27

1983 excessive use of force claims] with a precisely analogous case to demonstrate its prohibition" because "[t]he mere fact that a court has not held the particular action in question unlawful is insufficient to create immunity." *Martin*, 712 F.3d at 960–61 (quoting *Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007)).

In light of the previously mentioned disputes of fact surrounding the intentionality and circumstances of McKinley's initial shot, the Court cannot conclude at this stage that, as a matter of law, in viewing the evidence in the light most favorable to Plaintiff, McKinley and McDannald are entitled to qualified immunity. *See Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011) ("if genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper"). Several material questions of fact remain as to the sequence of events prior to the discharge of the former officers' weapons, and whether there continued to be a perceived risk from Thompson even after McDannald fired the first, second, third, or fourth through twelfth shots at him. It is unquestionable that an unarmed person posing no immediate threat to officers, even if the individual has fled from police, has a clearly established right to not be shot and killed. *See Murray-Ruhl*, 246 F. App'x at 347; *Ciminillo v. Streicher,* 434 F.3d 461, 468 (6th Cir. 2006). Moreover, with respect to McDannald, where the officer in question unloads multiple rounds into the suspect even after a perceived danger may have passed, "*Tennessee v. Garner* provides a 'clearly established' right that fulfills the second prong of the qualified immunity analysis". *Murray-Ruhl*, 246 F. App'x at 347.

The Court finds a reasonable officer in McKinley or McDannalds' positions would have been on notice that shooting at a suspect whose car has been driven into a ditch mere seconds prior, and who is not moving, where there is no evidence that the suspect is armed or has committed anything more than a traffic offense, is a violation of the suspect's Fourth Amendment rights. Accordingly, the Court finds that the former officers are not entitled to qualified immunity and

**DENIES** summary judgment on Plaintiff's § 1983 claims against McDannald and McKinley in their individual capacities.

### F.    Thompson's Decision to Flee

Defendants McDannald and McKinley argue that they are immune from suit because Thompson's death was "the result of the high speed chase he initiated." (Doc. No. 139 at 47.) They argue that Thompson, by fleeing from them, proximately caused his own death and thus they cannot be held liable. In making this argument, Defendants must overlook the undisputed fact that, in contrast to the cases they cite, Thompson had come to a full stop and was seated in his car when he was shot and killed, giving no indication that he was continuing his flight. Additionally, to the extent that Defendants might dispute this, the dispute is one of fact and thus is an issue for a jury. Accordingly, the McDannald Motion (Doc. No. 139) is **DENIED** to the extent that McKinley and McDannald are not immune from suit based on Thompson's decision to flee.

### G.    Lebanon's Municipal Liability

Lebanon moves for summary judgment on Plaintiff's § 1983 claim against it based on a theory of municipal liability, arguing the record does not contain sufficient facts to support these allegations. (Doc. No. 109 at 25–39.) Under § 1983, municipalities may be held directly liable only when their customs or policies are the "moving force" behind a constitutional violation. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690–91, 694 (1978). The adoption or deliberate non-adoption of a "policy or custom" that violates a plaintiff's constitutional rights is the sole manner in which a municipality can be held liable under § 1983. *See Schroder v. City of Fort Thomas*, 412 F.3d 724, 727 (6th Cir. 2005). There are effectively four actions that may serve as a predicate for establish municipal liability under § 1983. A plaintiff can challenge (1) the official action or policy of a municipality; (2) a policymaking decision by an individual with final decision-making authority; (3) a deliberately indifferent failure to screen, train, or supervise its

29

employees; or (4) a deliberate indifference to a clear and persistent pattern of illegal activity (a "custom") about which the municipal policymakers knew or should have known. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389 (1989); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 470 (1986); *Monell,* 436 U.S. at 694; *Thomas,* 398 F.3d at 433. In this case, Plaintiff relies principally on the third theory, involving allegations of Lebanon's deliberate indifference to constitutional danger in its hiring, training, and supervision of police officers. In addition, Plaintiff claims that by "ratifying" the conduct of the officers, it has adopted an unconstitutional practice. The Court examines each claim in turn.

      1.     Failure to Screen

Plaintiff claims that Lebanon has municipal liability for the constitutional violations of McKinley in this case in part because Lebanon should have known that, by hiring him, it should have known that he would commit a violation of the constitutional rights of members of the public. Lebanon moves for summary judgment, claiming that, although McKinley had a record of refusing to follow police procedures, because he had not previously used unconstitutionally excessive force, it could not have been obvious that he might do so in the future. (Doc No. 109 at 33.) The Court disagrees.

To hold Lebanon liable for inadequately screening McKinley in the hiring process, Plaintiff must show that adequate scrutiny of his background would have led a reasonable policymaker to conclude that the plainly obvious consequence of hiring him would be the deprivation of a constitutional right. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 410–11 (1997) ("*Bryan County.*"). In *Bryan County,* the employee who used unconstitutional force had a background with traffic and misdemeanor arrests, primarily "arising from a fight on a college campus where [he] was a student. In connection with this single incident, [he] was charged with assault and battery, resisting arrest, and public drunkenness." *Id.* at 413. The Supreme Court held

30

that this record was not sufficient to alert the hiring police department that the candidate would commit a constitutional violation. *Id.* at 414.

McKinley's background stands in stark contrast to that of the officer in *Bryan County*. While, as Lebanon argues, McKinley's substantial history of misconduct over the two years he was employed by the WPD before being fired does not include a fatal use of excessive force, it does include numerous instances of official insubordination, defiance, unlawful arrests, and violations of safety policies. (Doc No. 199 at 2–12.) This background is far from the collegiate misbehavior at issue in *Bryan County*. Had the LPD followed up with the WPD after McKinley evidenced untruthfulness in his CVSA examination, it would have discovered this background. That the LPD was deliberately indifferent to the truthfulness, the backgrounds, and the potential for unconstitutional conduct of its employment candidates is further evidenced by the fact that it did not follow up when McDannald showed untruthfulness on his CVSA examination. (*Id.* at 18–20.) The Court finds a reasonable jury could conclude that it is "obvious" that a person, who in only two years in law enforcement could amass a record of such misconduct as McKinley's, would eventually seriously violate the constitutional rights of a member of the public that he was hired to serve. The Lebanon Motion on this ground is therefore **DENIED**.

### 2. Failure to Train

Lebanon argues that a failure to train theory fails as a matter of law because Plaintiff cannot show that the alleged failure to train demonstrates deliberate indifference to the rights of Lebanon's inhabitants. (Doc. No. 109 at 34.) Lebanon further submits that any alleged failure to train did not present an "'obvious potential' for use of excessive deadly force" because the city had no "similar prior incidents of the use of deadly force." (*Id.* at 35.) Plaintiff responds that there is no need to prove that widespread patterns of improper behavior provided that a constitutional violation is a "highly predictable consequence" of a failure to train, and that the scenario of a high speed

vehicular pursuit followed by the use of firearms, is a common scenario for which it is obvious that officers need instruction. (Doc. No. 184 at 8.) Plaintiff further argues that there is an obvious need to train officers on proper weapons handling and transitioning between weapons and an apprehension after a high speed pursuit. (*Id.* at 19.)

To hold a municipality liable under § 1983 for deprivations of federal rights stemming from the municipality's failure to train employees, a plaintiff must show that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). The Sixth Circuit has identified two ways to demonstrate a municipality's deliberate indifference under a failure to train theory. First, a plaintiff may "show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (citation and quotation marks omitted). Alternatively, "'a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.'" *Id.* (quoting *Bryan County*, 520 U.S. at 409). *See Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (characterizing the second method as a "failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction"). The Sixth Circuit has made clear that, in light of *Canton*, 489 U.S. 378[11], where plaintiffs can demonstrate that a genuine issue of material fact remains as to

---

[11] The Court in *Canton* provided for failure-to-train theories of liability based on an "obvious need" for such training, stating that,

> The issue in a case like this one ... is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent city policy. It may seem contrary to common sense to assert that a municipality will actually have a policy of not

whether the offered training is adequate as a matter of law, summary judgment must be denied. *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992).

Here Plaintiff claims that there was an obvious need for training cruiser patrol officers in the procedures to be used in apprehending a suspect after a vehicle pursuit; that the training on these procedures given to patrol officers, including McDannald and McKinley, was nonexistent; and that Lebanon was deliberately indifferent to this obvious need. On the record before the Court, Plaintiff has provided sufficient evidence to create material disputes of fact, which, if believed, would suffice to establish her claim against Lebanon for municipal liability under § 1983.

First, Plaintiff has raised a genuine issue as to whether the LPD properly trained its cruiser patrol officers for their duties, which would obviously involve high-speed vehicular pursuits as a matter of course. In fact, Lebanon has presented no evidence whatsoever to the contrary, choosing instead merely to argue the point in its brief. (Doc. No. 109 at 34-36; 200 at 5–7.) Indeed, even Lebanon's own corporate representative, LPD Lieutenant Van Hook, testified that officers in pursuits can have sympathetic nervous system responses including tunnel vision and an adrenaline rush, and that there is a resulting clear need for officers to be trained specifically on how to deal with suspects following pursuits. (Doc. No. 174-5 at 32–34.) LPD Chief of Police Bowen agrees and acknowledged that officers need to be trained on the psychological and physiological effects of pursuit. (Doc. No. 175-2 at 27–28.) However, not a single member of the LPD whose testimony appears on this record, including McDannald and McKinley, can recall ever having received such training. (Doc. No. 199 at 137–139.)

---

taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

489 U.S. at 390.

In an effort to disprove the testimony of its own officials, and to raise a question regarding whether the LPD does provide training on apprehensions after chases, Lebanon has submitted the affidavit of one of its sergeants, Shane Petty, who states that he provided such training "on Friday" in 2008. (Doc. No. 197 at 2.) He does not, however, indicate how many Fridays or which dates were involved, who received that training, how many officers of the LPD received it, nor how any decision was made as to who would participate in it. He does not describe the content of the training, but merely describes the contents of the written material that is not distributed to any participants in the training. And finally, while by reference to an unauthenticated exhibit (which amounts to inadmissible hearsay) he makes that statement, not on personal knowledge, that McKinley received his training, the actual contents of the document belie his claim. The "record" of McKinley's training attendance in 2008 shows him present on only three Fridays, on none of which he received any training remotely connected to use of force, firearms, or any other relevant policy. (Doc. No. 210-1 at 2.)

Plaintiff has also presented evidence that the training the officers received did not include training on transitioning a weapon to the weak hand when attempting to pull out an ASP (Doc. No. 199 at 113), on felony stop procedures when a car accident has occurred (rather than a suspect stopping on his own) (Doc. No. 174-1 at 79), or on what an officer needs to do to approach vehicles when a pursuit is over (Doc. No. 199. at 114).

The Court finds Plaintiff has presented sufficient evidence to raise a genuine dispute as to whether Lebanon was deliberately indifferent to its failure to train its police officers. While Plaintiff has not alleged a pattern of similar excessive force complaints by motorists apprehended after high-speed chases, a reasonable jury could find that such constitutional violations are a foreseeable consequence from the lack of instruction on how to (1) maintain safety in suspect apprehension in light of the physiological effects of pursuit on officers; (2) deal with a suspect that

34

has crashed out and may be stunned by the impact; (3) transition between handling two weapons; (4) handle weapons while on unstable ground, and that the inadequate training amounted to a deliberate indifference to the Fourth Amendment rights of citizens who have contact with the LPD. *See Shaner*, 172 F.3d at 931. *Compare Cherrington v. Skeeter*, 344 F.3d 631, 647 (6th Cir. 2003) (holding it was foreseeable that police make warrantless arrests and will need to know about arrestees' rights to probable cause determinations within 48 hours of arrest) *with Plinton*, 540 F.3d at 464–65 (holding no evidence existed of the "obvious potential" for constitutional violations by a county hiring an experienced undercover officer who was familiar with department policies, had DEA training, and worked in a division with a good conviction rate and no prior complaints of misconduct).

For the above-stated reasons, the Court **DENIES** the Lebanon Motion on the failure to train theory.

### 3. Ratification by Failure to Supervise, Investigate, and Discipline

Lebanon next argues that Plaintiff's theories of liability stemming from her allegation that the LPD failed to investigate and discipline—and that these actions constituted ratification—should fail as a matter of law. (Doc. No. 109 at 38–40). The primary focus of Lebanon's arguments on each of these points is that there have been no documented prior uses of deadly force by the LPD, therefore no custom or pattern of prior abuse has been established. (*Id.*)

Plaintiffs can establish a policy of deliberate indifference for a failure to investigate incidents of officer abuse adequately when the lack of investigation and discipline amounts to a "ratification" of the constitutional violation. *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989); *see also Shaner*, 172 F.3d at 931; *Marchese v. Lucas*, 758 F. 2d 181, 188 (6th Cir.

1985).  Ratification is essentially a confirmation that the employee has conformed with municipal

policies.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

> The Sixth Circuit has explained that, to prevail on such a claim, a plaintiff
>
> must show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the [violation] here.

*Thomas*, 398 F.3d at 433 (citation omitted) (holding that plaintiff's failure to supervise claim cannot

survive summary judgment without showing more than officer's potentially excessive use of force

in the plaintiff's case).

In responding to Plaintiff's ratification arguments, Lebanon attempts to dissociate the issue

of custom or pattern from anything other than a narrowly defined custom or pattern of failure to

investigate prior uses of deadly force by LPD officers.  (*See* Doc. No. 109 at 37–38.)  However, a

custom or pattern that establishes municipal liability can be supported when "a series of decisions

by a subordinate official manifest[] a 'custom or usage' of which the supervisor must have been

aware [such that] the supervisor could realistically be deemed to have adopted a policy that

happened to have been formulated or initiated by a lower-ranking official.  *Praprotnik*, 485 U.S. at

130.

In a recent case, this Court found that a plaintiff did not sufficiently allege that the failure to

investigate at issue "followed a clear and persistent pattern within the Department" such that the

plaintiff met the standard for ratification.  *Harrison v. City of Dickson, Tenn.*, 3:11-CV-01044, 2013

WL 1482950, at *14 (M.D. Tenn. Apr. 11, 2013) (internal quotation marks omitted).  However, in

*Harrison*, the plaintiff "offered *no* evidence that the Department inadequately investigated other

use-of-force incidents or complaints."  *Id.* (emphasis added).  By contrast, here, the LPD Personnel

Early Warning System ("PEWS"), which alerts the LPD when an officer has engaged in four or

36

more pursuits and uses of force in a twelve-month period, had identified McKinley four times for his use of force and pursuit prior to the Thompson incident. (Doc. No. 199 at 21–23) The PEWS alert forms have a section for "Actions Taken in Response to Alert," but in McKinley's case the forms indicate no response taken. (*Id.* at 23.) McKinley was among the officers with the highest number of use of force incidents throughout his time at the LPD. (*Id* at 25.) Significantly, in the January prior to the Thompson shooting, another man attempted on multiple occasions to file a report of unjustified use of force by McKinley with the LPD, but an investigation was never opened by the LPD and he alleges that he was continually rebuffed in his attempts to file a complaint. (*Id.* at 37.) The Court finds that Plaintiff has raised material questions of fact on the issue of whether Lebanon had a custom of failing to investigate McKinley's potential misconduct.

The evidence on this record is also sufficient for a jury to conclude that the investigation the LPD made into the Thompson incident was so inadequate as to amount to a ratification of the officers' actions. Most notably, the highest-level officials in the LPD, the Commissioner of Public Safety and the Chief of Police, explicitly ratified the actions of the officers who shot Thompson, both making public statements, before the internal investigation was complete, that the officers had acted according to LPD policy. (Doc. No. 199 at 100.) Further, according to the uncontradicted testimony of Plaintiff's expert on police practices, Dr. Gregory Alpert, the investigation performed by Detective Melvin for the LPD into the shooting was "incomplete, deficient and conducted in a manner that helped exonerate the officers and ratify their behavior." (Doc. No. 199 at 176.) Numerous undisputed facts support this conclusion, including the facts that Melvin had no training or experience in conducting this type of investigation; that the investigation did not start immediately after the shooting; that the officers were not separated; that Melvin did not question the officers during the investigation; that Melvin did not review the videotapes and dispatch tapes in their entireties; that inconsistencies in the officers' accounts of the incident were not explored; and

37

that Melvin did not speak to any of the other officers who were on the scene or to the officers' supervisors. (Doc. No. 199 at 101-115.)

The Court also finds that Plaintiff has raised material questions of fact on the issue of whether Lebanon had such a persistent pattern of failing to investigate and discipline officer misconduct such that officers would predictably violate constitutional rights. For example, it is undisputed that the LPD does not have an Internal Affairs Division or standard operating procedure for investigations of officer misconduct. The evidence that the citizen who attempted in various ways to lodge a complaint against McKinley in the months prior to the Thompson shooting was thwarted in those efforts supports Plaintiff's contention that the LPD discouraged citizens from making complaints, and that discipline against them is therefore not imposed. (Doc. No. 199 at 180.) "This creates an atmosphere where improper behavior is tolerated and, therefore, foreseeable." (*Id.*)

The Court finds that based on the undisputed evidence of LPD's failure to discipline the officers for shooting Thompson while violating LPD policy, as well as the evidence on this record of a persistent failure by LPD to take complaints and to investigate, document, and discipline misconduct, Plaintiff has raised a triable issue of fact as to whether Lebanon ratified the actions of the officers and is therefore liable to Plaintiff.

H.    *Claims against Supervisory Officials in their Individual Capacities*

In addition to claiming that Lebanon has municipal liability in this case for its unconstitutional policies and practices in hiring, training, supervising, and disciplining police officers, Plaintiff claims that two of Lebanon's supervisory officials, Weeks and Bowen, are liable to Thompson in their individual capacities for their deliberate indifference to the potential consequences of these deficiencies. Weeks and Bowen have moved for summary judgment on that

38

claim, alleging both that there was no constitutional violation in this case, that there is insufficient evidence of their deliberate indifference, and that, in any event, they are entitled to qualified immunity.

As more fully discussed above, this Court finds that the evidence, both disputed and agreed upon, regarding the actions and omissions of Lebanon in its police practices and policies is sufficient to create a material dispute on the question of municipal liability. Therefore, to the extent that Bowen and Weeks rely on the proposition that there is insufficient evidence of unconstitutional indifference to Thompson, their motion is denied.

The Court uses the same legal framework for assessing qualified immunity for Weeks and Bowen that it used for McKinley and McDannald. The Second Bowen Motion on qualified immunity grounds, however, requires the Court also consider the extent to which they had "fair warning" that the deficiencies in their supervision were in violation of a constitutional right. *Cummings*, 418 F.3d at 687. In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. This "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct at 2083.

Plaintiff argues that, although there is no binding case law on point, the individual supervisors should have known that the absence of a policy on post-pursuit procedures in the LPD was unconstitutional. (Doc. 183 at 7-8.) Plaintiff has provided no authority that would establish that Bowen and Weeks were on notice of the unconstitutionality of this omission in LPD's procedures. The Court therefore finds, that, while a reasonable jury might conclude that the policies and practices of Lebanon (and, as its highest-ranking law enforcement officials, Defendants Bowen and Weeks) were unconstitutional, these Defendants did not have "fair warning" of that unconstitutionality. Therefore, Defendants Weeks and Bowen are entitled to qualified immunity

and the Second Bowen Motion (Doc. No. 155) on the single claim against Bowen and Weeks is **GRANTED**.

### I. State Law Claims

In addition to her federal claims, Plaintiff alleges state law causes of action against McDannald, McKinley, and Lebanon. She states several of these claims as grounds for relief under alternative legal and factual theories, as she is entitled to do under both the federal and state procedural rules. Fed.R.Civ.P. Rule 8(e)(2); TN R RCP Rule 8.05. In short, Plaintiff claims that, if intentional, the acts of the officers in shooting at Thompson were a violation of the Fourth Amendment. In the alternative, if McKinley's pulling of the trigger was accidental, as all Defendants argue, Plaintiff claims that McKinley was negligent and that he or Lebanon as his employer is liable under a state negligence theory. (Doc. No. 184 at 34.) In addition, Plaintiff states a negligence claim against Lebanon for its training and supervision of the officers. (*Id.* at 24.) The officers and Lebanon move for summary judgment on these state law claims on various grounds, as follows.

First, on Plaintiff's claim that, if McDannald and/or McKinley's actions in causing Thompson's death were unintentional, they were negligent as a matter of Tennessee common law (Count VI), McDannald moves for summary judgment on the ground that the undisputed facts show that his actions were "reasonable." (Doc. No. 139 at 39–44.) McKinley does not argue that he was not negligent, but rather that, under the TGTLA, Tenn. Code Ann. §§ 29–20–101 to 29–20–408, if he was negligent he is immune and instead Lebanon is liable as his employer for his negligence. (Doc. No. 139 at 52–53.)

Second, on Plaintiff's claim that, if McDannald and/or McKinley's actions in causing Thompson's death were intentional, those acts amounted to assault and battery, (Count VII), McDannald moves for summary judgment on the ground that his actions were justified. (Doc. No.

40

204 at 11–12.) McKinley does not actually claim that his actions were unintentional or justified but argues merely that his actions are "irrelevant." (*Id.* at 12.) Both Defendants also move for summary judgment on this claim on the ground that if their actions were tortious, under the TGTLA they are immune and instead, Lebanon is liable. (Doc. No. 139 at 52–53.)

Third, on Plaintiff's claims that, under the TGTLA, Lebanon is vicariously liable as their employer to the extent that McDannald and/or McKinley were negligent in causing the death of Thompson (Count IV), Lebanon moves for summary judgment on the ground that it "arises out of… civil rights," and therefore falls under the "civil rights" exception to the waiver of governmental immunity in the TGTLA. (Doc. No. 200 at 13–17.)

Finally, on Plaintiff's claim that Lebanon is liable to Plaintiff for its own negligence in training and supervising McDannald and McKinley (Count V), Lebanon moves for summary judgment on the ground that, like the claims for vicarious liability for negligence, the claims fall under the "civil rights" exception to the TGTLA's waiver of immunity and also that it is immune under the "public duty" doctrine. (Doc. No. 200 at 17–21.)

### 1. State Law Claims Against McDannald and McKinley

The McDannald Motion is straightforward. Just as there are sufficient facts from which a jury could conclude that the officers are liable for a violation of the Fourth Amendment, there are sufficient facts from which a reasonable jury could conclude that both McDannald and McKinley committed tortious acts, whether assault, battery, or negligence, in causing Thompson's death. (*See* § D, *supra.*) Indeed, McKinley does not even argue the contrary. McDannald and McKinley enjoy immunity from liability only to the extent to which their employer, Lebanon, may have vicarious liability for their acts. They have common law immunity to the same extent that they have qualified immunity, *Rogers v. Gooding*, 84 F. App'x 473, 477 (6th Cir. 2003), and, as noted above,

41

McDannald and McKinley are not entitled to qualified immunity at the summary judgment stage.[12]

The McDannald Motion is thus **DENIED** as to the state law claims in Counts VI and VII.

2.     State Law Claims Against Lebanon

The issues of Lebanon's liability for the officers' and its own possible tortious conduct under the TGTLA are more complex, and require an analysis of the application of the TGTLA's "civil rights" exception to the disputed facts present in the current posture of this case.

Section 29–20–205 of the TGTLA specifically waives the state's immunity "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment," unless the injury arises out of certain enumerated intentional torts, including "civil rights." Tenn. Code Ann. § 29–20–205(2) (2012). The "civil rights" exception to the TGTLA's waiver of immunity has not been well construed by the Tennessee courts and has, therefore, presented numerous difficulties for federal courts hearing cases alleging both federal civil rights and Tennessee tort claims. Most recently, the Sixth Circuit has held that when a state law claim is brought together with a federal civil rights claim, and the state claim "arises out of the *same circumstances* giving rise to her civil rights claim under § 1983," the state claim will be subject to the civil rights exception and the government will be immune. *Johnson v. City of Memphis,* 617 F.3d 864, 872 (6th Cir. 2010) (emphasis added). In determining the applicability of the TGTLA's civil rights exception to particular claims in a single lawsuit, district courts must "parse the [T]GTLA issues on a claim-by-claim basis," so as to compare the allegations and acts underlying each claim. *Partee v. City of Memphis*, 449 F. App'x 444, 449 (6th Cir. 2011).

Seeking to avoid all liability, in this case Lebanon vigorously argues on the one hand that Thompson's death was due to the entirely accidental actions of McKinley in pulling the trigger of his gun while moving toward Thompson's crashed and stationary car, and that there was therefore

---

[12] McDannald and McKinley assert their common law immunity from suit at Doc. No. 139 at 52–53.

no violation of his civil rights. (Doc. No. 109 at 22-24.) On the other hand, citing *Johnson*, Lebanon argues just as vigorously that the case is based on civil rights, not negligence, and that it is therefore entitled to claim the "civil rights" exception to the waiver of its liability under the TGTLA. (*Id.* at 39–40.)

In *Johnson*, the court held that when a single undisputed set of facts is claimed to constitute both a civil rights violation and an act of negligence, the civil rights exception to the TGTLA's waiver of government liability for employee torts applies. 617 F. 3d at 871–72. In contrast, in this case, as noted, a reasonable jury could find either that McKinley fired intentionally—whether as a warning shot or directly at Thompson—or that the shot was accidental and negligent. These two scenarios are not "the same circumstances." *Id.* at 872. The first would certainly give rise to a civil rights claim, but the second would not. If the jury finds that Thompson's death was caused only by the unintentional but negligent act of McKinley, there is no civil rights violation out of which the case "arises." In this latter circumstance, Lebanon would be vicariously liable for the officers' negligence. The Lebanon Motion as to Count IV is therefore **DENIED**.

Lebanon's motion for summary judgment on the claim that it was negligent in its training and supervision of the officers stands on a different footing. The facts alleged by Plaintiff in support of her claim that Lebanon was negligent are identical to the facts she advances in support of her claim for municipal liability under § 1983. In her briefing on Lebanon's negligence with respect to training and supervision Plaintiff points to no set of possible factual circumstances which differentiate this claim from her civil rights claim. Thus, as in *Johnson*, Plaintiff's negligence claim "arises out of the same circumstances giving rise to her civil rights claim under § 1983. It therefore falls within the exception listed in § 29-20-205, and the City retains its immunity." *Id.* As a result, the Court finds Lebanon immune from suit on Plaintiff's state law claim in Count V and this claim is DISMISSED.

## IV. CONCLUSION

For the reasons above, the Court:

**GRANTS in part** and **DENIES in part** the Lebanon Motion (Doc. No. 108). Plaintiff's state law claim against Lebanon in Count V is dismissed, and her remaining claims survive.

**DENIES** the McDannald Motion (Doc. No. 138);

**GRANTS** the First (Doc. No. 141) and Second (Doc. No. 155) Bowen Motions;

**DENIES** Plaintiff's Objections and Motion to Strike Defendant City of Lebanon's Statement of Additional Undisputed Facts in Support (Doc. No. 209);

**DENIES without prejudice** Plaintiff's Objection to and Motion to Strike Certain Statements of Undisputed Facts Filed by Defendants McKinley and McDannald (Doc. No. 167);

**GRANTS in part**, for the purposes of summary judgment only, Plaintiff's Motion to Exclude the Testimony of Defendant's Expert Witness William J. Lewinski, PhD (Doc. No. 111);

**DENIES without prejudice** Plaintiff's Motion to Exclude the Testimony of Defendant's Expert Witness Kenneth R. Wallentine (Doc. No. 115);

**DENIES without prejudice** Plaintiff's Motion to Exclude the Testimony of Defendant's Expert Witness Ronald L. Crew (Doc. No. 118);

And **TERMINATES as moot** Defendants Bowen and Weeks' Motion to Exclude Portions of Plaintiff's Rule 26(b)(6) Expert Disclosures of Geoffrey Alpert

44

(Doc. No. 136) and *Daubert* Motion to Exclude Testimony (Doc. No. 153) of the same expert.

The various motions for leave to file excess pages (Doc. Nos. 103; 105; 106) are **TERMINATED as moot**.

It is so ORDERED.

Entered this the ____10____ day of June, 2014.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT